PETROLEUM CARRIER CORPORA-
TION, a Florida corporation,
Plaintiff,

v.

The UNITED STATES of America, and
the Interstate Commerce Commis-
sion, Defendants.

No. 65-212-Civ-J.

United States District Court
M. D. Florida,
Jacksonville Division.

Aug. 19, 1966.

Martin Sack, of Sack & Sack, Jacksonville, Fla., for plaintiff.

Sol H. Proctor, Jacksonville, Fla., and Beverley S. Simms, Washington, D. C., for Geo. A. Rheman Co., Inc.

Frank A. Graham, Jr., Columbia, S. C., and Schwartz, Proctor & Bolinger, Jacksonville, Fla., for Laney Tank Lines, Inc.

L. A. Odom, Spartanburg, S. C., James J. Williams, Washington, D. C., and Sol H. Proctor, Jacksonville, Fla., for Associated Petroleum Carriers.

Before JONES, Circuit Judge, and Mc-RAE and YOUNG, District Judges.

## OPINION

GEORGE C. YOUNG, District Judge.

Plaintiff, Petroleum Carrier Corporation (P.C.C.) seeks judicial review of an Order of the Interstate Commerce Commission granting certificates of public convenience and necessity to Laney Tank Lines, Incorporated (Laney), The George A. Rheman Co., Inc. (Rheman), and Associated Petroleum Carriers (Associated Petroleum), for each to operate as a common carrier, by motor vehicle, in interstate or foreign commerce, over irregular routes, of petroleum products in bulk in tank vehicles from terminals off the Colonial Pipeline in Georgia, South Carolina, and North Carolina to points in those three states. In particular, grants of authority from Augusta, Georgia, to points in South Carolina, and from North Augusta (Sweetwater), South Carolina, to points in Georgia, are protested as being issued arbitrarily and without adequate legal basis. The Commission's Order affirmed and adopted the findings and recommendations of a joint board before which this case was initially heard pursuant to Section 305, Title 49 U.S.C.

Plaintiff in this case holds authority to transport petroleum products, as a motor common carrier, in interstate commerce from the origin point of Augusta, Georgia, and points within 15 miles thereof, to points in South Carolina and in Georgia within 175 miles of the origin point. Since North Augusta (Sweetwater), South Carolina, is within a 15 mile radius of Augusta, Georgia, plaintiff has authority to transport petroleum products from North Augusta (Sweetwater), South Carolina, to points within 175 miles thereof, which includes substantially all of the areas of South Carolina and Georgia. Plaintiff was the only carrier, prior to this case, holding authority from North Augusta (Sweetwater) to Georgia points.

Until the recent construction of a spur to Augusta, Georgia, from the Colonial Pipeline which runs north and south through the westerly portions of Georgia and South Carolina, there had been no recent movements from Augusta or North Augusta (Sweetwater).

Prior to the Colonial line and its spur, Augusta, Georgia, only had a river port terminal, and North Augusta, South Carolina, had no terminal at all from which motor carriers could transport petroleum products. Presently, only one servicing terminal has been constructed off the spur line; that terminal is in North Augusta, South Carolina, and is used by the plaintiff to service the American Oil Company. So far only a relatively small amount of petroleum products has been moved from the North Augusta terminal, but the plaintiff and the American Oil Company, as well as several other shippers, expect that very shortly a large volume of traffic will be moved from the Augusta origin point. Accordingly, construction of other terminals has been planned, including one in Augusta, Georgia.

P.C.C. has rendered adequate service from the Augusta river port in the past and from the North Augusta pipeline terminal since its completion in 1963. Now, since the access terminals of the Colonial Pipeline have caused a slackening of traffic from the Augusta river port, plaintiff desires to handle the additional traffic that will move off the Colonial Pipeline at the Augusta origin. The decline of river port traffic has left the plaintiff with idle equipment that could be utilized to haul the increased

volume of petroleum products to be moved.

The completion of the entire Colonial Pipeline in early 1964, caused a noticeable change in the distribution and marketing pattern of petroleum products. The numerous access terminals up and down the Colonial Pipeline provided new origin points from which petroleum products could be distributed by tank truck to nearby territories. As a result, regional carriers were threatened with a major diversion of their traffic from the origin points they served to the Augusta origin point.

This prompted a number of motor carriers including Laney, Rheman, and Associated Petroleum, to file applications with the Interstate Commerce Commission to obtain certificates authorizing them to transport petroleum products from the Augusta origin point, was well as from other points not pertinent to this appeal.

Various shippers who were proposing to construct terminals at Augusta or North Augusta or use other shipper's terminals there, testified in support of the applications of Laney, Rheman, and Associated Petroleum. These shippers noted that the traffic which would move through the Colonial Pipeline was the same traffic that the named carriers previously had handled when the traffic had been moved by ocean tanker, river barges, or through other pipelines. The shippers expressed their desire to have the same carriers available to service them from each of the terminals along the pipeline so that the particular carrier employed could render a complete integrated service.

Moreover, the shippers testified that it would be preferable to have multiple carrier service available from each of the pipeline terminals so they could be assured of the service of several carriers at a particular point. It is the usual practice in the industry for several carriers to serve a particular terminal point.

Both P.C.C. and Associated Petroleum had authority from Augusta but the lat-

ter's interstate authority did not include any Georgia destination points. Associated Petroleum could transport interstate from Augusta, Georgia and North Augusta, and Sweetwater, South Carolina, to points in North and South Carolina, and under its *intrastate* authority, from Augusta, Georgia to points in Georgia. To that extent Associated Petroleum was competitive with P.C.C. at the Augusta origin point. But the transportation of petroleum products from North Augusta and Sweetwater, South Carolina into Georgia, being interstate movements, could be done only by the plaintiff. By seeking the additional grant of authority that is here on review, Associated Petroleum seeks to also service traffic from the North Augusta terminal to points in Georgia and thus become fully competitive with P.C.C.

All the shippers appearing testified in support of Associated Petroleum and the joint board found that there was "a need for the continued availability of its (Associated Petroleum) services from the new origins as well as the old", and that no protestant could afford the scope of service Associated Petroleum was providing or proposed to provide. It was granted authority, as pertinent here, from terminals off the Colonial Pipeline in South Carolina to points in Georgia so that its authority from the Augusta and North Augusta (Sweetwater) points equaled (and exceeded) that of plaintiff's.

Laney was supported by Humble Oil Refining Co. and Phillips Petroleum Co. for movements between South Carolina and Georgia and between other points not pertinent to the issues here. It held no interstate authority from Augusta, Georgia, or North Augusta or Sweetwater, South Carolina.

The joint board concluded as to Laney:

"The need of the shippers for a complete service from all Colonial terminals and to have at least two authorized carriers available in order to insure service convinces us that this carrier should be authorized to op-

erate * * * between Georgia and South Carolina."

Service was authorized from terminals off the Colonial Pipeline (1) in Georgia to points in South Carolina, (2) in South Carolina to points in Georgia, and (3) in North Carolina to points in South Carolina. The grants under (1) and (2) above gave Laney authority from Augusta and North Augusta (Sweetwater) origins competitive to plaintiff's existing authority from those points.

As pertinent here, Rheman had authority between Charleston, South Carolina, and points within 10 miles thereof, on the one hand, and, on the other, points in North Carolina and Georgia; between Savannah, Georgia, and points within 10 miles thereof, on the one hand, and, on the other, points in South Carolina. Hence, Rheman had authority between Charleston and Augusta, and between Savannah and North Augusta (Sweetwater) and to that limited extent was competitive to P.C.C.

The joint board found that, by its application, Rheman was seeking:

" * * * to protect its South Carolina traffic, part of which, * * *, is being diverted to Thrift (Charlotte, North Carolina), which is but 15 miles from the South Carolina border. It, therefore, takes the position that it must be able to serve South Carolina from all Colonial terminals in North Carolina and Georgia if it is to protect its present traffic * * *."

The board concluded: "Applicant Rheman is also supported by Humble which it has served for many years. It has also participated in the traffic of Gulf, Texaco, and Amoco, some of which is subject to diversion due to the pipeline. In order to ensure that these shippers have multiple carrier service available from each terminal in the territory, a requirement we deem justified by the evidence of record, this applicant should be accorded authority coextensive with that granted to Laney."

In its background discussion of the various applications, the joint board frankly stated:

"Essentially what is involved is the relocation of sources of supply of traffic destined into North Carolina, South Carolina, and Georgia, which formerly moved over the two existing pipelines mentioned (Plantation and Southeastern) or which moved by ocean tanker and barge to port terminals such as Augusta and Savannah, Georgia, Charleston, South Carolina, and Morehead City, North Carolina, for distribution by tank truck into the nearby territory."

If the grants of authority were grounded *solely* on the "follow the traffic" theory they would conflict squarely with the Commission's holding in Smith and Solomon Trucking Company v. United States, 61 M.C.C. 748 (1953) where the Commission rejected an application for authority by a carrier which sought to follow the traffic of a shipper that the carrier had been serving. There the Commission stated (page 752):

"We * * * are compelled to conclude that a grant of authority on a mere showing of loss of traffic without proof of lack of adequate existing service in the new location would be contrary to law and to sound reasoning. * * * There is no basis in the law as written which permits a common carrier to 'belong' to a particular shipper, or conversely, a shipper to belong to a particular common carrier. * * *

Our principal concern is with the public interest. If the interest of an individual carrier and the public are compatible in a particular situation, then a grant of authority may be warranted, otherwise a carrier which is about to lose a shipper must face the unfortunate risks attendant upon any business. * * * "

The Smith and Solomon decision, supra, was affirmed by a three judge district court, Smith and Solomon Trucking

Co. v. United States, 120 F.Supp. 277 (D. C.N.J.1954), where the Court held:

> " * * * the Commission must carefully weigh the entire relevant situation. If after that, a carrier application based on a 'follow the traffic' conception is shown to be reasonably required by public convenience and necessity (which would include proper allowance for other carrier rights and for the national transportation policy) the 'follow the traffic' principle invoked might very well be the determining feature in the decision as to whether the application should be granted." (At page 279)

■ The Smith and Solomon case, then, does not entirely reject any consideration to a "follow the traffic" basis for authority but teaches that "follow the traffic" cannot alone be the ground for granting authority. If there are, or may be, other factors justifying the grant based on public convenience and necessity, a carrier might be allowed to follow the traffic.

In this case there is no question but that the applicants, Associated Petroleum, Laney and Rheman sought to "follow the traffic." But was there evidence to support the findings of the joint board as adopted by the Commission and were the applicable standards of law properly applied to those findings?

■■ The Interstate Commerce Commission has broad administrative discretion in certifying carriers. Its function is not only to appraise the facts and to draw inferences from them but also to bring to bear upon the problem an expert judgment and to determine from its analysis of the total situation on which side of the controversy the public interest lies. United States v. Detroit and Cleveland Navigation Company, 326 U.S. 236, 241, 66 S.Ct. 75, 90 L.Ed. 38 (1945). Therefore, in reviewing an Order of Certification of the Commission, this Court is not authorized to substitute its judgment for that of the Commission. Rather, it is the function of this Court only to ensure that the judgments of the Commission

have a rational basis; that is, whether the conclusions of the Commission are based on substantial evidence and whether the Commission has applied standards of law arbitrarily or erroneously to reach its conclusions.

■ In this case the Commission found a need for more than one carrier based on the expected volume of traffic from the Augusta area terminals in the light of the experience of the industry at the terminals previously served. There was substantial evidence for such a finding even though a different conclusion might be reached by this Court if it were authorized by Congress to be the expert fact finder. But this Court has no such authority; it can only review to determine if there is substantial evidence to support the Commission's factual findings.

Witnesses for Phillips Petroleum Company, Humble Oil Co., and the American Oil Company, all expressed a need for service by more than one carrier. The joint board chose to give sufficient weight to that testimony to conclude that the evidence justified a finding that public convenience and necessity required that multiple service be available to the shippers from each terminal.

■ Can a need for more than one carrier satisfy the legal standards of public convenience and necessity even though no specific inadequacy of existing service is found? An affirmative answer is amply supported by Commission and Court precedent.

In Arnold Ligon Extension, MC–35396 (Sub. No. 17) 71 MCC 695, the Commission granted additional authority to a motor carrier to operate from a point already served by an existing protesting motor carrier. The Commission found that the shipper should have available to it at its new plant site the established transportation facilities in the area (which required the grant of authority).

In Doral Palleson Extension, MC–40971 (Sub. No. 1) 76 MCC 421, the Commission, in granting new authority

to a destination point already serviced by existing carriers, said:

"In our opinion the evidence establishes that there will be considerable tonnage used in the construction of the Flaning Gorge Dam; and that there will be substantial movements to the dam, to the various facilities at the dam site, and to the town site nearby. The opposing carriers assert that no inadequacy has been shown in this service; and they should be accorded the opportunity to handle all available traffic before any additional service is authorized. We believe, however, that where, as here, an obvious need for additional service arises by reason of the construction of a large-scale public project, the carriers operating in and reasonably near the territory should be authorized to extend their services to the new project, transporting the commodities handled under their present certificates."

In United States v. Detroit and Cleveland Navigation Company, supra, the Supreme Court of the United States, speaking through Mr. Justice Douglas, held:

"Its (the Commission's) doubt that the public interest will be adequately served if resumption of service is left to existing carriers is entitled to the same respect as its expert judgment on other complicated transportation problems. * * * Forecasts as to the future are necessary to the decision. But neither uncertainties as to the future nor the inability or failure of existing carriers to show the sufficiency of their plans to meet future traffic demands need paralyze the Commission into inaction. *It may be that the public interest requires that future shipping needs be assured rather than left uncertain. The Commission has the discretion so to decide.*" (Emphasis added.)

In the recent case of Nashua Motor Express, Inc. v. United States, 230 F. Supp. 646, page 652 (D.C., N.H.1964), a three judge court, in reviewing an or-

der of the Interstate Commerce Commission, said:

" * * * cases show that inadequacy of present service is not a term which is convertible with that of public convenience and necessity, but is, rather, only one element to be considered in arriving at the broader determination of public convenience and necessity.
* * * Other elements of importance appear to be the desirability of competition, the desirability of different kinds of service, and the desirability of improved service."

In A. B. & C. Motor Transp. Co., Inc. v. United States, 69 F.Supp. 166 (D.C., Mass.1946), in affirming the Commission's grant of authority the Court said:

"The Commission's decision that the transportation service proposed by the applicant is required by public convenience and necessity is not invalidated by the absence of a positive finding that existing carriers are not providing adequate transportation facilities. An increase in competition is not a reason for denying the Commission's authority to issue a certificate."

In addition, the grant of authority to Associated Petroleum, as pertinent here, merely increased the scope of its authority from an origin point it was already serving. In approving a Commission decision granting extended authority at an origin point in C. E. Hall & Sons, Inc. v. United States, 88 F.Supp. 596 (D.C.Mass.1950), it was stated:

"Bearing in mind the Commission's expertness and primary responsibility in weighing the factors affecting public convenience and necessity and the well-understood limitations on judicial review in this type of case, we cannot say, on the basis of the Commission's findings, that it was irrational to conclude that the present and future public convenience and necessity would be served by the limited enlargement of applicant's existing authority as provided in the order. The word 'necessity' in the broad statutory formula

must not be taken too literally, especially in a case like the present, as implying that a transportation crisis of major proportions would ensue unless the application were granted. If that were the meaning, the use of the word 'convenience' would be an obvious superfluity."

While the extension of authority granted Associated Petroleum in this case is not as limited as that granted in C. E. Hall & Sons, supra, the basic reasoning in the latter case for affirming the Commission's action is equally applicable here as to Associated Petroleum.

It is clear from the conclusions set forth by the joint board, as adopted by the Commission, that the effect of increased competition on existing carriers was given consideration; the board concluded:

"In each instance * * *, the board finds that the authority granted will enable each applicant to maintain its competitive posture, while meeting the complete needs of the supporting shippers, and will minimize adverse economic consequences from the loss of traffic now handled. The impact of these grants of authority upon the prospective protestants is minor and overbalanced by the foregoing considerations."

It appearing, for the foregoing reasons, that the Commission's action complained of here was supported by substantial evidence and in compliance with applicable law, the Complaint will be dismissed.

## DISSENTING OPINION

JONES, Circuit Judge.

So far as I am aware, no serious contention has been made that Petroleum Carrier Corporation is unwilling or unable to furnish adequate service under its certificate of public convenience and necessity. The fact that one or more shippers would prefer to have more carriers qualified is not, in my opinion, adequate justification for a determination that certificates should be granted to other lines.